IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PAMELA ONUSKO

    Plaintiff

v.                                          Civil Case No. L-09-1080

JP MORGAN CHASE BANK, NA.

    Defendants

o0o
**<u>MEMORANDUM</u>**

Plaintiff, Pamela Onusko, brings this action against her former employer, JP Morgan Chase Bank, NA ("Chase"), advancing claims of fraudulent misrepresentation, negligent misrepresentation, and deceit. Now pending is Chase's Motion for Summary Judgment. Docket No. 49. The issues have been comprehensively briefed, and on July 15, 2011 the Court heard oral argument. For the reasons stated herein, the Court will, by separate Order, GRANT the Motion.

**I.     BACKGROUND**

The following facts are set forth in the light most favorable to the Plaintiff. In 2006, the subprime mortgage market was in full swing. Pamela Onusko was employed by Wells Fargo Home Mortgage ("Wells Fargo") as a subprime division manager, where she headed a team of 350 employees responsible for over one billion dollars in sales. The position was lucrative; Onusko's total annual compensation ranged from $650,000 to $800,000.

Jim McCraw and Desmond Smith are former Wells Fargo employees. In 2004, Smith

1

left Wells Fargo to become Chase's senior vice president for business development, and in 2005 he was also put in charge of Chase's subprime mortgage unit. Smith offered McCraw, who was still at Wells Fargo, the position of national sales manager. McCraw accepted and joined Chase as well. The two then began to craft a strategy to expand Chase's subprime division. They settled on a goal of quadrupling Chase's subprime sales volume, then at $800M to $900M per year, and increasing the sales force from 200 people to 800. As part of their plan, they would attempt to draw loan officers and managers from other firms in the industry. McCraw would be largely in charge of the recruiting efforts, but Smith would get involved in the case of "top producers." During 2006 they hired a large number of people, several of whom came from Wells Fargo.

Onusko had reported indirectly to McCraw when both were at Wells Fargo, and after McCraw left for Chase the two kept in touch. In the spring of 2006, McCraw began to actively recruit Onusko. He told her that Chase was committed to rapidly growing its subprime mortgage unit. McCraw further promised Onusko that she would head up the mid-Atlantic division, which was being held for her, that she would have the ability either to bring her team with her from Wells Fargo or to recruit and hire a team, and that her total compensation would be between $750,000 and $950,000 per year.

Smith also met with Onusko, and repeated many of McCraw's assurances. He told her that "Chase was the place to be," and gave her a copy of a document entitled "Winning in Non-Prime[1] Retail Business Plan." See Defs.' Mot. Summ. J. Ex. 2. The plan outlined Chase's strategy to become a "Top Three Non-Prime Lender By 2009," which included significant

---

[1] The parties use "non-prime" as a euphemism for what is more commonly referred to as the subprime mortgage market—that is, mortgages made at higher rates and on less favorable terms to borrowers who present a higher risk of default.

growth in the company's subprime operations. Id. at 2–3, 7–13.

On August 16, 2006, Chase formally offered Onusko the position of Non-Prime Retail Division Manager. See Aug. 16 Offer Letter, Defs.' Mot. Summ. J. Ex. 3, Docket No. 49-2. The offer letter anticipated that Onusko would start on September 18, 2006, and report directly to McCraw. It recited that her compensation would consist of a base salary of $75,000, plus a "non cumulative draw of $27,083 monthly for 12 months with an annual minimum total of $325,000," plus a discretionary bonus of $200,000 to be paid half in cash and half in restricted Chase common stock.[2] Id. at 1.

The letter went on to discuss terms of employment, benefits, and the orientation process, but was silent as to the transfer or hiring of Onusko's sales team. Finally, the letter contained an integration clause, which read: "This letter contains the entire understanding between us and supercedes [sic] any prior verbal or written communication related to terms and conditions of this offer of employment." Id. at 2. Onusko rejected the position, explaining that she was not ready to move and that Chase had offered her less than she was making at Wells Fargo.

On September 22, 2006, Chase sent Onusko a second offer, sweetening its proposal. See Sept. 22 Offer Letter, Defs.' Mot. Summ. J. Ex. 4, Docket No. 49-3. Chase promised the same base salary, but increased the monthly draw amount to "$31,250 with an annual maximum total of $375,000." Id. at 1. It also "guaranteed" the $200,000 discretionary bonus. Id. Like the previous letter, the September 22 offer made no mention of a sales team and ended with an integration clause. Within a week of receiving the second letter, Onusko contacted both Smith

---

[2] The parties never explain precisely what is meant by "non cumulative draw." The compensation structure in the mortgage banking industry is complex, but what emerges from the record with sufficient clarity for purposes of deciding this case is the general proposition that a manager's compensation is largely dependent on the production of his or her team. Thus, the larger Onusko's team, and the greater the volume of mortgages they financed, the higher her compensation would be.

3

and McCraw to decline, telling Smith that "I was choosing to stay with Wells Fargo and that was the end of it." Onusko Dep. 93:13–14.

From October of 2006 through mid-March of 2007, the parties had no formal dealings, but Onusko spoke to McCraw occasionally by telephone. When asked about the purpose of the conversations, Onusko responded: "We were friends. We had been friends for many years. So, you have that networking. That's a common thing among businesspeople, and just what's going on, just general discussion, how are you doing, how is life, how are things, miscellaneous conversations with miscellaneous people." Onusko Dep. 95:8–19. Though Chase made no further formal offer of employment, Onusko maintains that "general discussion" about the possibility of her leaving Wells Fargo continued. Id. at 95:21–96:4.

On March 15, 2007, Onusko received the unexpected news that Wells Fargo was exiting the subprime sector and, as a result, eliminating her position. She was offered the new position of primary manager for the Baltimore area, a job in Wells Fargo's traditional mortgage division with a similar compensation structure. Instead, she immediately informed her manager that she would be leaving to join Chase.

Later that day, Onusko telephoned McCraw and informed him that she was ready to move. McCraw responded that he would need some time to talk to Smith and to "see what we can put together." Id. at 47:21–22. On April 5, 2007, Chase made its formal offer. The divisional manager position it had previously offered was temporarily unavailable, but Chase proposed to make Onusko regional manager, with the assurance that she would be promoted to divisional manager within a few months.

The April 5, 2007 offer letter, like Chase's previous letters, contained an integration clause and made no mention of a team. Nevertheless, Onusko maintains that Chase "reassured

4

her that as regional manager she would have absolutely the same ability to hire members of her sales team from Wells Fargo." Compl. ¶ 15., Docket No. 1. She concedes, however, that the parties never discussed specifics, such as a budget or the number of people she would be permitted to hire. Onusko accepted the offer, and on April 23, 2007 she began work at Chase's office in White Marsh, Maryland.

Onusko's career at Chase did not go as planned. Less than a month after she began work, Chase instituted what it characterized as a temporary hiring "pause."[3] McCraw explained that Chase "just hired so many people that we felt like we have to just take a pause and get those folks indoctrinated into the system and let operations catch up with the volume." McCraw Dep. 84:2–5. According to Smith, who made the initial decision to halt hiring, economic concerns also played a role.

> [T]he pause happened as soon as I realized that we can have a problem. . . . Pause so that I can figure out what the hell is going on so I can make an informed decision. Instead of letting it go on, you stop, digest, and then if it is right you keep going, if not, then that pause becomes a hiring freeze.

Smith Dep. 115:25–116:8. Onusko was promoted to divisional manager as promised, but without the ability to grow the team on which her compensation largely depended. She oversaw an existing Chase team of between 100 and 150 employees, but was unable to hire from Wells Fargo or elsewhere.

At some point in late 2007 and early 2008, as the subprime mortgage market was hit by increasing turmoil, it became clear that the hiring pause was unlikely to be lifted. Smith described the conditions as follows:

---

[3] The parties have debated at length whether "pause" or "freeze" is the proper term for Chase's cessation of hiring, and of what, if any, difference in meaning exists between the two. The Court sees no distinction, and will use the terms interchangeably throughout.

5

> People we were hiring were having trouble producing loans because the market had backed up and interest rates had gone up. Market backed up—they are very related, right. The market stared to freeze, people are starting to pull back, interest rates are rising or points are expanding therefore, less people qualify, so your people can't be productive because they can't sell the product.

Id. at 116:12–20. In early 2008, Chase eliminated Onusko's divisional manager position. It made her an area manager, a lesser title that she held for approximately four months. On August 15, 2008, as Chase continued to contract its operations, it demoted Onusko again, this time to loan officer. On November 25, 2008, Onusko formally resigned. Chase eventually exited the subprime mortgage industry altogether.

On April 27, 2009, Onusko filed the instant lawsuit. The Complaint contains three counts: Fraudulent Misrepresentation (Count One), Negligent Misrepresentation (Count Two), and Deceit (Count Three). After an extended period of discovery, Chase filed the Motion for Summary Judgment now before the Court.

I. LEGAL STANDARD

The Court may grant summary judgment when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial). Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. Pulliam Inv. Co. v. Cameo Properties, 810

F.2d 1282, 1286 (4th Cir. 1987). Hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 962, 967 (4th Cir. 1995).

## II.    ANALYSIS

### a. Negligent Misrepresentation and Deceit Claims

Under Maryland law, to state a prima facie case of either fraudulent misrepresentation or deceit, a plaintiff must establish five elements: (1) that the representation made was false, (2) that its falsity was either known to the speaker, or the misrepresentation was made with such a reckless indifference to truth as to be equivalent to actual knowledge, (3) that it was made for the purpose of defrauding the person claiming to be injured thereby, (4) that such person not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth, and that she would not have done the thing from which the injury resulted had not such misrepresentation been made, and (5) that she actually suffered damage directly resulting from such fraudulent misrepresentation. Miller v. Fairchild Inds., Inc., 629 A.2d 1293, 1301–02 (Md. Ct. Spec. App. 1993).[4]

---

[4]   In her opposition brief, Onusko lists a different set of elements relating to her deceit claim: "To prevail on deceit, a plaintiff need only show: (i) Defendant owed a duty to disclose a material fact; (ii) Defendant failed to disclose that fact; (iii) Defendant intended to defraud or deceive the plaintiff; (iv) Plaintiff justifiably relied on the non-disclosure; and (v) suffered damages because of it. Lloyd [v. General Motors Corp.], 397 Md. [at] 138, 916 A.2d at 375 [sic, recte 274]." Pl.'s Opp. 21, Docket No. 51.
   These are not the elements of a deceit claim. Rather they are, as the Lloyd court stated, "[t]he essential elements for a claim of fraudulent concealment." Lloyd v. General Motors Corp., 397 Md. 108, 138 (2007). The elements of deceit—those listed above—are identical to the elements of fraudulent misrepresentation (sometimes also referred to in the case law simply as fraud). See, e.g., VF Corp. v. Wrexham Aviation Corp., 350 Md. 693, 703 (1998) ("This Court has set forth the elements of the tort action of fraud or deceit in numerous opinions.") (collecting cases).

7

"Predictions or statements which are merely promissory in nature and expressions as to what will happen in the future are not actionable as fraud." Id. at 342 (internal quotation omitted). This general rule does not apply, however, if the defendant's statements "are made with the present intention not to perform." Id. at 343. The requirement of a "present intention not to perform" is simply a different way of stating the third element listed above, that the statement be made for purposes of defrauding the victim. For a statement about the future to be made with such a purpose, it must be a prediction that the declarant never believes will come true.

All of Onusko's claims are premised on the broad allegation that Chase lured her into its employ with promises that it would support her, dedicate resources to her division and, most importantly, allow her to hire her 350-person sales team away from Wells Fargo. As an initial matter, the Court notes that none of these alleged promises could be considered an enforceable term of her employment contract, and Onusko does not assert a breach of contract claim. The parties have spilt a great deal of ink debating whether the purported representations were ever made in the first place and, if they were, whether Onusko's reliance on them would be reasonable.[5] In the end, these disputes are immaterial. Onusko cannot prevail because, even after extensive and supplemental discovery, she has unearthed no evidence from which a jury

---

[5] The Court does pause to note that reliance on any representations made during Chase's initial recruitment efforts, which Onusko firmly rebuffed, would certainly be unreasonable. This is clear both from the passage of time and from changed circumstances. When Onusko contacted McCraw after being informed that her position at Wells Fargo was to be eliminated, she was told that Chase would have to "put something together" for her. Eventually, Chase informed her that the divisional manager position she had previously been offered was unavailable, and offered to hire her as a regional manager instead.

This change in the lay of the land means that Onusko could only reasonably rely on representations made in connection with the offer of the regional manager job. Nevertheless, for purposes of this Motion, the Court assumes the truth of Onusko's claim that she was told she would have "absolutely the same ability to hire members of her sales team from Wells Fargo." Compl. ¶ 15., Docket No. 1.

could find that McCraw, Smith, or anyone else at Chase knew that the statements were false at the time they were allegedly made.

All of Chase's representations fall squarely within the category of predictions or promissory statements. In order to prevail, Onusko must, therefore, establish that Chase never intended to follow through. Thus, Chase must have made its offer of employment to Onusko with knowledge or reckless disregard of the possibility that economic problems would lead to a permanent hiring freeze, with the end result that Chase would never permit Onusko to hire her team or otherwise provide the support it had promised.

Initial discovery turned up no evidence of any such knowledge on Chase's part. Onusko, undeterred, moved to compel additional discovery of emails spanning the period from her rejection of Chase's September 22, 2006 offer through June 1, 2007. She urged that information from this "critical period" would establish that Chase knew in advance that it would not be able to make good on its promises. The Court preliminarily denied the request because Onusko's own deposition testimony established that she and McCraw had only social conversations during this period and did not discuss any specific job offer or terms. Because this fact suggested the absence of any relevant communication concerning Onusko or representations made to her, the Court determined that "requiring [Chase] to produce the requested documents would cost far more—in terms of both money and time—than is justified by the potential return." Order Denying Mot. to Compel, Docket No. 38.

Following the supplemental depositions of Smith and another Chase executive, Onusko renewed her motion. Chase objected on two grounds. First, it argued, Onusko had no evidence tending to suggest that a hiring freeze, and much less a permanent one, was in contemplation at

9

the time. Second, Chase estimated that because the emails in question existed only in tape backup form, the cost to comply with Onusko's request would be approximately $89,000.

While the Court agreed that Onusko's request smacked of a fishing expedition, it nevertheless ordered Chase to resurrect and search email traffic during this "critical period." Nor did the Court require Onusko to bear any of the cost for this search. Though the Court ordered that the search encompass only emails to or from Jim McCraw, it is satisfied that this additional discovery gave Onusko every opportunity to prove her case.

From the record unearthed, it is evident that Chase did not intend a permanent hiring freeze because it failed to read the signs pointing to the coming day of reckoning in the subprime housing market. The new discovery does reveal that there was talk of hiring pauses in certain regions throughout the company as early as January of 2007, but it also makes clear that these were intended to be both localized and temporary. In a January 25, 2007 email that appears to be a summary of current recruiting and hiring efforts, McCraw lists one unidentified region as "basically frozen." He also states, "We are holding off on downtown Los Angeles and entire Fresno/Ventura County Region" and "We have stopped working on the city of Dayton Ohio <u>until the hiring moratorium is finished</u>." Email from James McCraw to Linda Goldsmith (Jan 25, 2007, 5:44 p.m.), Docket No. 75-1 (emphases supplied).

The email makes mention of active hiring in several other regions, including Cincinnati, Akron, and Woodland Hills. No mention is made of any territory in the mid-Atlantic. It is clear that freezes were targeted to specific areas (e.g., downtown Los Angeles) and did not reflect a companywide policy. This is supported by a January 31, 2007 email in which Desmond Smith addresses an apparent rumor that Chase was thinking of exiting the subprime mortgage arena: "I don't know you [sic] but we (Chase) would not be investing the MILLIONS we are currently

10

investing in hiring talent (over 500 people) in the last 12 months and opening a 3rd operations site. Trust me . . . Chase is committed!" Email from Desmond Smith to Kevin Gillis (Jan 31, 2007, 4:28 p.m.), Docket No. 75-2.

Chase formally offered Onusko the position of regional manager on April 5, 2007. Some three weeks later, on April 20th, it announced a companywide hiring freeze for its subprime business. This decision was communicated in an email from a divisional manager named Dean Moran to several recipients throughout the firm. An extended quote is appropriate here.

> All,
> The other Divisionals and I had our business meetings with Jim McCraw, Desmond Smith and Pablo Sanchez this week. . . . [Pablo Sanchez] reinforced the positive outlook and the dedication that Chase remains to have for Non Prime. In his words, "We are in it to win and nothing short of that."
> \* \* \* \*
> It has been decided that in order to achieve a positive ROI – that <u>we are going to put a temporary "pause" not "freeze" on hiring.</u> By doing so our P&L will be free of the massive amounts of incurred expense associated with hiring and training. . . .I personally feel that we have all had our recruiting hats on and that is by design, but in doing so – we may have may have [sic] short changed our people to some extent.
> \* \* \* \*
> <u>We will get back to hiring in the long term</u>. However, it is going to become a much more scientific approach. . . . <u>Growth and prudency will become synonymous terms</u>.
> \* \* \* \*
> We are building something that will hopefully become the model of a well run/well built Non Prime Division. This pause is a good thing. Let's take this time and reinvest in our people and accelerate out seasoning curve.

Email from Dean J. Moran to multiple recipients (April 20, 2007, 11:30 a.m.), Docket No. 75-4 (first and second emphases supplied).

This email like the rest of the new discovery, belies Onusko's contention that Chase knew a permanent hiring freeze was set to go into effect when it hired her. All available

11

evidence shows that everyone within Chase believed at the time that the freeze would be merely temporary, and that the company would continue to hire and grow its subprime mortgage business in the future.

Onusko's argument seems to be that Chase foresaw the collapse in the subprime market and recklessly recruited her with unrealistic promises that it never intended to honor. Putting aside the illogic that this argument imputes to Chase, there is no evidence to sustain it. The record shows that Chase, like others in the industry, expected the housing bubble to keep expanding, that it expected business and prices to continue ramping up after a brief pause, and that it expected to resume expansion of its subprime mortgage division to become a "Top Three Non-Prime Lender By 2009." See Winning in Non-Prime Retail Business Plan, Defs.' Mot. Summ. J. Ex. 2. Had this view proved accurate, there is no reason to think that Chase could not, or would not, have kept Onusko in the divisional manager position and allowed her to hire a full team as promised.

History has proven that the housing bubble was artificial and unsustainable. The record shows that Chase, like many other banks, was looking at the future through rose-colored glasses. It also shows that Onusko shared the same unrealistic optimism. As an industry insider, she too failed to spot what we now know were unmistakable warning signs. One of those signs was the decision of her former employer, Wells Fargo, to abandon the subprime market. By leaving Wells Fargo, Onusko took a business risk that the subprime party would continue. She must accept the consequences of that decision.

The fact that the subprime industry took countless jobs with it when it collapsed is regrettable, but the failure to foresee such a turn of events is not fraud. Chase is entitled to summary judgment on Onusko's deceit and fraudulent misrepresentation claims.

### b. Negligent Misrepresentation Claim

Onusko's negligent misrepresentation claim must fail for the same reason. To establish a prima facie case of negligent misrepresentation in Maryland, a plaintiff must demonstrate: (1) the defendant owed her a duty of care,[6] (2) the defendant asserted a false statement, (3) the defendant intended that the statement would be acted upon by the plaintiff, (4) the defendant had knowledge that the plaintiff would probably rely on the statement which, if erroneous, would cause loss or injury, (5) the plaintiff, justifiably, took action in reliance on the statement, and (6) the plaintiff suffered damage proximately caused by the defendant's negligence. Weisman v. Connors, 312 Md. 428, 444 (1988). While negligent misrepresentation does not require the same showing of scienter as fraudulent misrepresentation or deceit, it still requires a showing that the alleged statements were false when made. See Abercrombie v. Nationwide Mut. Ins. Co., 999 F.Supp. 660, 664 (D. Md. 1998) (explaining that the falsity of a statement "when made [is] the sine qua non of fraud or negligent misrepresentation under Maryland law.") (citing Gross v. Sussex Inc., 332 Md. 247, 259 (1993)).

For the reasons already stated, no reasonable jury could find that the promises Chase allegedly made to Onusko were promises that it did not intend to honor at the time. Absent any direct evidence, Onusko would have the Court infer the falsity of Chase's representations ex ante from the fact that they turned out to be false ex post. In her own words, "I do believe that Chase misled me in believing that we were going to grow and build because none of that came true." Onusko Dep. 50:18–20. Her pleadings echo this fallacious reasoning. Moreover, even if one could infer some level of foreknowledge on the part of high-ranking executives as to what would become of their industry, a party opposing summary judgment "cannot create a genuine issue of

---

[6] The parties have agreed that in this case the employment relationship gave rise to a duty of care.

13

material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Chase is entitled to summary judgment on Onusko's claim of negligent misrepresentation.

### III. CONCLUSION

For the foregoing reasons, the Court will, by separate Order of even date, GRANT Defendant Chase's Motion for Summary Judgment.

Dated this 4th day of November, 2011

/s/
_____
Benson Everett Legg
United States District Judge